Harvey JONES *v.* ARKANSAS DEPARTMENT
OF HUMAN SERVICES

CA 99-1015 19 S.W.3d 58

Court of Appeals of Arkansas
Division III
Opinion delivered June 7, 2000
[Petition for rehearing denied July 5, 2000.]

*Sullivan Law Firm, P.L.L.C.*, by: *Kelly J. Adkins*, for appellant.

*Kathy L. Hall*, for appellee.

*Merry Alice Hesselbein*, attorney *ad litem* for the minor child.

ANDREE LAYTON ROAF Judge. Harvey Jones, who is incarcerated at the Calico Rock Unit of the Arkansas Department of Correction, is the putative father of three-and-a-half-year-old R.J. Jones appeals from an order of the Pulaski County Chancery Court terminating his parental rights to R.J., arguing that the evidence is insufficient to support the termination order. We affirm.

R.J. was born on November 1, 1996. Her mother, Torshanda Stephenson, was seventeen years old when R.J. was born. Stephenson, along with a different child who is not involved in this appeal, had been declared dependent/neglected on January 5, 1996. Stephenson, however, disrupted her foster-care placement and was a runaway until August 16, 1996, and again from September 9, 1996, to October 23, 1996, when she was admitted to a hospital for observation. Upon her discharge two days later, she was again ordered into foster care; however, she walked away from her caseworker when the worker stopped to fill some prescriptions for her. On December 6, 1996, appellee Arkansas Department of Human Services (DHS) obtained an *ex parte* order to take R.J. into custody.

Stephenson attended the December 13, 1996, emergency hearing on the dependency-neglect petition, however, Jones did not appear. At the January 17, 1997, adjudication hearing, however, Jones did appear, represented by counsel. Jones testified that he had three felony convictions, two for aggravated robbery and one for assault and battery on another inmate while he was in prison.

According to Jones, he served twelve-and-a-half years of his thirty-year sentence for his second aggravated robbery conviction before being released on parole. He got married soon after his release, but was separated and a divorce was pending. He admitted that he moved in with Stephenson after he separated from his wife, but before filing for divorce. He also admitted that he met and impregnated Stephenson when she was only sixteen years old and that he was thirty-one at the time, but claimed that Stephenson told him she was nineteen. Jones also stated that he was a certified nursing assistant and was working approximately two days per week at a nursing home on an as-needed basis. Although R.J. was continued in DHS custody, Jones was allowed supervised visitation at DHS's offices. It was noted that Jones signed the birth certificate, and he was ordered to pursue paternity.

At the first review hearing on May 19, 1997, Jones and Stephenson seemed to be making progress on the case plan, however, Jones had still not established paternity and was once again ordered to do so. Although R.J. continued in DHS custody, the goal of reunification was affirmed. At a September 22, 1997, review hearing, however, it was brought to the court's attention that Jones had been incarcerated. At the first of two permanency placement hearings on January 16, 1998, Jones testified that his parole was revoked on July 25, 1997, because he was involved in a hit-and-run accident. Nonetheless, he expected to be released in May. The hearing was continued to July 13, 1998, and it was learned that Jones had not been released. At that time, DHS recommended termination of parental rights of both Stephenson and Jones.

At a December 7, 1998, hearing on the termination petition, adoption specialist Brenda Keith testified that R.J. was adoptable and that there were nineteen families on the adoption list that matched the characteristics needed for the child. Most of the other testimony concerned Stephenson's failure to follow the case plan and inability to provide for the needs of R.J. Almost all of the evidence concerning Jones came from his own testimony. He stated that he was unsure as to how long it would be before he was eligible for parole, but stated that his release date was 2007. Jones admitted that he had five major disciplinary write-ups during his current term of imprisonment and was currently in Class 4 status due to these infractions, meaning that he could not receive visitors, send or receive letters, or use a telephone. Nonetheless, he claimed that his

poor disciplinary record would not imperil his chances for parole. Jones also admitted that he never took any steps to establish paternity.

After the hearing, the trial court terminated the parental rights of both Stephenson and Jones. The court noted that while Jones claimed that he would be eligible for release in 2007, the "usual practice" was to require that he serve the balance of his sentence, which was scheduled to run until at least 2012. It also noted that Jones had failed to take steps to establish his paternity, that he had used "extremely poor judgment" in his relationship with Stephenson, that Jones had a history of violating the law, and given his history, there was no indication that after his release Jones would not "reoffend and be re-incarcerated." As a basis for termination, the court found that Jones had been sentenced in a criminal proceeding for a period of time that would constitute a substantial period of R.J.'s life and that the child's need for permanency and stability weighed in favor of termination.

On appeal, Jones argues that the trial court erred in finding that there was sufficient evidence to terminate his parental rights to his minor child, citing *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992), for the proposition that termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. He concedes that he only lived with R.J. for a few months before she was taken into DHS custody, but he asserts that he bonded with the child and "he had every intention of taking care of his family," as shown by the fact that he continued to live with Stephenson until he was incarcerated. Further, he contends that even if it cannot be found that he had significant contact with R.J., he wanted to establish paternity before he was reincarcerated. He claims that the allegations of neglect were directed at Stephenson, not him, and DHS failed to determine whether he would be a suitable father. Furthermore, he argues that he complied with the court orders "for the most part" and visited R.J. when he was not working or incarcerated. Citing *Bush v. Dietz*, 284 Ark. 191, 680 S.W.2d 704 (1984), he contends that his failure to support and visit R.J. after he was sent to prison should not count against him. Jones blames DHS for not helping him arrange visitation, and he asserts that he could not call, have visitors, or send and receive personal mail because he was in Class 4 prisoner status. Finally, he claims that he was sentenced to an amount of time that does not reach the

"substantial" period required by Ark. Code Ann. § 9-27-341 (Repl.1998), when a parent is incarcerated. This argument is without merit.

 ██ Under Arkansas Code Annotated § 9-27-341 (Repl. 1998), termination of parental rights is permissible if there is an "appropriate permanency placement plan for the juvenile," and the trial court finds by clear and convincing evidence:

(1) That it is in the best interest of the juvenile, including consideration of the following factors:

(A) The likelihood that the juvenile will be adopted if the termination petition is granted, and

(B) The potential harm caused by continuing contact with the parent, parents, or putative parent;

(2) Of one (1) or more of the following grounds:

. . .

(B) The juvenile has lived outside the home of the parent for a period of twelve (12) months, and the parent has willfully failed to provide significant material support in accordance with the parent's means or to maintain meaningful contact with the juvenile. To find willful failure to maintain meaningful contact, it must be shown that the parent was not prevented from visiting or having contact with the juvenile by the juvenile's custodian or any other person, taking into consideration the distance of the juvenile's placement from the parent's home. Material support consists of either financial contributions or food, shelter, clothing, or other necessities where such contribution has been requested by the juvenile's custodian or ordered by a court of competent jurisdiction. It is not necessary that the twelve-month period referenced in this subdivision (b)(2)(B) immediately precede the filing of the petition for termination of parental rights, or that it be for twelve (12) consecutive months;

. . .

(H)(i) The parent is sentenced in a criminal proceeding for a period of time which would constitute a substantial period of the juvenile's life and the conditions in subdivision (b)(2)(A) or (B)) of this section have also been established.

(ii) For purposes of this subsection, "substantial period" means a sentence, and not time actually served, of no less than fifteen (15) years, none of which has been suspended;

The stated intent of Arkansas Code Annotated § 9-27-341 is "to provide permanency in a juvenile's life in all instances where return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare, and it appears from the evidence that return to the family home cannot be accomplished in a reasonable period of time." When the burden of proving a disputed fact in chancery court is by clear and convincing evidence, the inquiry on appeal is whether the chancery court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous. *Anderson v. Douglas, supra.* Clear and convincing evidence is defined as "that degree of proof which will produce in the fact finder a firm conviction as to the allegation sought to be established." *Id.* In making such determination, we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.*

■ ■ Contrary to Jones's assertions, he did not maintain meaningful contact with R.J. First, R.J. lived with him and Stephenson for only a month before one-month-old R.J. was taken into DHS custody on December 6, 1996. Less than eight months later, his parole was revoked and his contact with R.J. ceased. While he was incarcerated, contact still would have been possible had he not engaged in activities that resulted in his loss of privileges. Furthermore, by virtue of his parole revocation, he was effectively "sentenced" to the remainder of his thirty-year sentence and either has a new fifteen-and-a-half-year sentence or has been "sentenced" to thirty years, of which he has already served fourteen and a half years. Arkansas Code Annotated § 9-27-341(2)(H)(ii) requires only that the sentence exceed fifteen years, not that fifteen years actually be served. Accordingly, we affirm the trial court's termination of Jones's parental rights.

Affirmed.

CRABTREE and KOONCE, JJ., agree.